699 A.2d 722

**Dianna L. CABLE, Appellant,**

v.

**Emmanuel S. ANTHOU, Appellee.**

Supreme Court of Pennsylvania.

Argued March 5, 1997.

Decided Aug. 20, 1997.

Reargument Denied Oct. 23, 1997.

Kevin J. McKeon, for Dianna L. Cable.

Sanford S. Finder, Washington, for Emmanuel S. Anthou.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

■■■■■■

*OPINION*

NEWMAN, Justice.

■ This appeal stems from a child support action in which the Court of Common Pleas of Washington County (trial court) ordered Appellant Dianna Cable (Cable), her daughter, and Appellee Emmanuel Anthou (Anthou) to submit to a second buccal swab [1] DNA paternity test after the first buccal swab DNA test revealed that Anthou was not the father of Cable's child. Cable appeals from the Superior Court Order reversing the Order of the trial court. The issue before us is whether the trial court may compel Anthou to submit to a second, duplicate buccal swab DNA test absent evidence that the initial test was not reliable for the determination of paternity. We hold that the party requesting an additional paternity test must prove that the first test was defective before the court can compel a second paternity test. We, thus, affirm the Order of the Superior Court.

## FACTUAL AND PROCEDURAL HISTORY

On November 3, 1993, Cable gave birth out-of-wedlock to a baby girl. The birth certificate lists Anthou as the father. Although Anthou and Cable had arranged to give the baby up for adoption, after the birth, Cable decided to raise the child as a single parent. On December 30, 1993, Cable filed a

---

1. A "buccal swab" is one of the alternative methods to blood extraction for obtaining DNA samples to conduct paternity testing. The Superior Court described buccal swab DNA testing as follows:

 A buccal swab is a cotton or Dacron covered wooden stick [resembling a Q-tip] which is placed between the teeth and the inner cheek lining. The swab is then gently wiped against the surface of the cheek which loosens cells known as buccal epithelial cells. Those cells contain intact DNA which can be tested. The parties being tested each have four swabs collected which are then used to conduct six or seven tests. Each individual test is a genetic marker "system" and each "system" has a certain number of genetic markers contained in it. The DNA samples from both the alleged father and the child are mixed and used as the control standard. The genetic markers, or bands, of the alleged father, mother, child and the mix are then compared. If after testing all of the systems, two of the systems do not pick up the alleged father's bands in the child's bands, then the man is considered excluded from paternity.

 *Cable v. Anthou*, 449 Pa.Super. 553, 555, 674 A.2d 732, 733 (1996).

petition seeking child support from Anthou, who denied paternity at a support hearing on February 1, 1994. The court ordered the parties to submit to blood testing pursuant to Section 4343 of the Domestic Relations Code, 23 Pa.C.S. § 4343, which governs genetic testing to determine paternity of children born out-of-wedlock. Prior to the date set for the blood testing, Washington County changed the method of testing from blood extraction to buccal swab DNA sampling.

Roche Biomedical Laboratories (Roche) administered the buccal swab tests, which revealed that Anthou was excluded as the father.[2] At Anthou's request, the trial court issued a Rule to Show Cause why it should not dismiss the support complaint. Cable filed an Answer and New Matter, asserting the following: (1) Anthou was estopped from denying paternity because of his numerous acknowledgments of fatherhood before the paternity test; and (2) the buccal swab paternity testing is scientifically flawed, therefore a blood test should be administered.[3]

The trial court rejected the estoppel argument but ordered an evidentiary hearing on the issue of the scientific soundness of the buccal swab test. Cable submitted the expert report of Moses Schanfield, Ph.D., Laboratory Director of the Analytical Genetic Testing Center, Inc., in which he stated that his company does not use buccal swab DNA tests for paternity cases because they preclude the use of non-DNA markers, such as blood type and blood grouping, that are available through blood tests to verify that a mix-up in samples has not occurred. Dr. Schanfield did not, however, state that the test conducted in this case was defective or inaccurate, or that buccal swab DNA tests in general are unreliable.

**2.** Roche conducted seven independent genetic marker systems tests on the DNA samples. Five of the tests were non-exclusionary, and two of the tests positively excluded Anthou as the father. Based on the positive exclusions, Roche concluded that Anthou was excluded as the father of the child.

**3.** Although she did not specify the type of testing to be performed on the blood samples, at the hearing on her motion, Cable specifically requested that the court order human leucocyte antigen (HLA) blood grouping tests (as opposed, for example, to DNA blood testing).

Clifton Harris, Ph.D., Associate Director, Department of Paternity Evaluation, Roche Biomedical Laboratories, Inc., testified at the hearing regarding Roche's method of obtaining and testing the buccal swab samples. He estimated that Roche conducts approximately 50,000 paternity tests per year, from both blood and buccal swab samples, and of those, he was aware of only one case in which a blood sample had been mislabeled. He did not believe that the tests here were mishandled. Furthermore, he opined that buccal swab DNA testing is more accurate in excluding fathers than HLA blood grouping tests. Even if an HLA blood grouping test included Anthou as the father in this case, he would nevertheless conclude that Anthou was not the father based on the results of the DNA test.

Cable also presented another expert, Jeanne Thomas, Ph. D., who described the difference between the type of DNA testing she performs in the molecular diagnostic lab at Allegheny General Hospital and the type of testing performed by Roche. She did not testify that Roche's method of testing is inherently unreliable, nor did she state that Roche did not correctly perform the tests in this case. Instead, Dr. Thomas was concerned about a sample mix-up because the preprinted sample collection form that the Roche technician used was for blood samples, not buccal swabs.[4] She could not, however, cite any other reason for her concern.

The trial court concluded that Cable did not prove by a preponderance of the evidence that the buccal swab DNA tests were scientifically flawed; therefore, Cable was not entitled to a second test in the form of HLA blood grouping pursuant to *DeAngelo v. Murray*, 536 Pa. 206, 638 A.2d 966 (1994) (denying request for additional blood test because proponent did not first demonstrate that the initial blood test was unreliable). The trial court also rejected Cable's argument that she was entitled to an HLA test as additional

4. Dr. Harris explained that because the buccal swab method of obtaining DNA is relatively new, Roche decided to use the remaining "blood sample" forms before employing the newer "buccal swab sample" forms. R.R. at 72a.

evidence to the DNA test pursuant to *Mastromatteo v. Harkins*, 419 Pa.Super. 329, 615 A.2d 390 (1992) (permitting DNA tests subsequent to HLA blood grouping test without showing that HLA test was not dependable because DNA test would provide additional, more accurate determination of paternity). Nevertheless, after concluding that the buccal swab does not implicate Fourth Amendment privacy considerations due to its minimal intrusiveness, the trial court ordered the parties to submit to a second buccal swab DNA test. Anthou appealed to the Superior Court.

The Superior Court reversed the trial court and held that despite the degree of "intrusiveness" of a buccal swab, a proponent is not entitled to an additional round of paternity tests pursuant to *DeAngelo* unless he or she first proves that the latest test was unreliable. It reasoned that *DeAngelo* was not premised on Fourth Amendment considerations, but instead on the reliability of the initial test. The Superior Court held that unless the proponent of the second test demonstrates that there is reason to doubt the accuracy of the first test, a subsequent test would be duplicative and irrelevant;[5] therefore, it remanded for further proceedings.

We granted allocatur to decide whether a trial court can order a second buccal swab DNA test to decide paternity when there is no evidence that the first buccal swab test was inaccurate. We hold that unless the person requesting the second test proves, by a preponderance of the evidence, that the initial test was unreliable, a court may not order a second test.

## DISCUSSION

Section 4343 of the Domestic Relations Code permits a court to order genetic testing to determine paternity,

5. Judge Del Sole filed a concurring and dissenting opinion based on his belief that *DeAngelo* was based on Fourth Amendment considerations because it adopted *Koleski v. Park*, 363 Pa.Super. 22, 525 A.2d 405 (1987), which was premised entirely on constitutional interests. Applying the *Koleski* test, however, he agreed that Cable had not met her burden of demonstrating that the first test was inaccurate or undependable.

23 Pa.C.S. § 4343. That section provides, in pertinent part, as follows:

§ 4343. Paternity

(c) Genetic tests.—

(1) Upon the request of any party to an action to establish paternity, the court shall require the child and the parties to submit to genetic tests.

(2) Genetic test results indicating a 99% or greater probability that the alleged father is the father of the child shall create a presumption of paternity which may be rebutted only by clear and convincing evidence that the results of the genetic tests are not reliable in that particular case.

23 Pa.C.S. § 4343(c). The term "genetic tests" includes any blood or tissue testing used to resolve paternity. 23 Pa.C.S. § 4302. The buccal swab method of obtaining tissue to conduct DNA testing falls within this definition. Although the statute is silent regarding the number of tests a court may order, we have held that a party is entitled to only one test, and, only when that test is defective or unreliable can the court order a second test. *DeAngelo.* *See also Koleski v. Park,* 363 Pa.Super. 22, 525 A.2d 405 (1987). Alternatively, a court can order a second test if it is more accurate and will provide *additional,* not duplicative, information. *Mastromatteo.*

The Superior Court first articulated this limitation on the number of paternity tests a court may order in *Koleski.* In that case, Denis Koleski claimed paternity of a child born to Kathy Park. Park, however, denied that Koleski was the father. The trial court ordered blood testing of the parties and the results excluded Koleski as the father. Koleski requested a second blood test and Park objected. The trial court granted the request. On appeal, the Superior Court reversed and remanded the case to the trial court. First, the Superior Court recognized that compulsory administration of a blood test implicates Fourth Amendment protections. It noted, however, that "[t]he Fourth Amendment's 'proper function is to constrain, not against all intrusions [into the body for

blood] as such, but against intrusions which are not justified in the circumstances.' " *Id.* at 29, 525 A.2d at 408 (quoting *Schmerber v. California,* 384 U.S. 757, 768, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966)).

To conclude whether the second test was justified in *Koleski,* the Superior Court weighed the interests of all parties. First, it stated that the mother had an undeniable right to her bodily integrity, and to be free from invasions into her body. The putative father, however, also had a right to the companionship, care and custody of his child. Likewise, the child had an inherent interest in determining paternity not only to enjoy her father's care and companionship, but also to obtain rights to her father's estate, financial support, and other economic benefits. *Koleski,* at 30, 525 A.2d at 408. Thus, to protect against invasions of privacy while advancing both the interests of children and parents in determining paternity, the *Koleski* court restricted the situations in which a second blood test may be ordered. Consequently, it held that a trial court may order subsequent blood tests to ascertain paternity only when the proponent has first shown by a preponderance of the evidence that the initial test was inaccurate, unreliable or improperly conducted or interpreted. *Id.* at 29–32, 525 A.2d at 408–410.

This Court addressed the same issue in *DeAngelo,* where the first HLA blood grouping test resulted in a 90% probability of paternity, the second DNA blood test excluded the alleged father as the biological parent, and then the mother requested a third paternity test to clarify the discrepancy. The trial court ordered the third test and the Superior Court affirmed. On appeal to this Court, the putative father argued that the mother was not entitled to a third test because she had not shown a defect in the last test.

*DeAngelo* addressed whether the most recent test was reliable, and not the intrusiveness of the tests or the privacy considerations implicated by them. We held that "[a]dditional testing will not be permitted merely on the basis that different tests reach different results. Rather this Court requires a

showing that the latest test administered was defectively performed." *DeAngelo*, at 207, 638 A.2d at 968. *DeAngelo* prevents a party from repeatedly requesting additional testing in an effort to either harass the other party or to obtain more favorable results. In other words, there must be a compelling reason to order more testing.

Here, however, Cable argues that the decision in *DeAngelo* was based entirely on Fourth Amendment considerations and rests on the nature of the intrusiveness of the tests. Cable contends that buccal swabs are not "intrusive," and therefore do not implicate Fourth Amendment interests. Accordingly, she asserts that *DeAngelo* does not apply here and she was not required to show that the initial test was inaccurate or unreliable. Her analysis of *DeAngelo* is incorrect.

Although we must always be conscious of constitutional protections, this Court did not decide *DeAngelo* based on those interests. Section 4343 of the Domestic Relations Code authorizes the initial genetic testing to decide paternity. We are sensitive to the fact that testing for paternity has the potential for harassment if a court were to grant every request for an additional test. As a result, the results of the initial paternity test remain viable and binding in the determination of paternity unless and until the proponent of the second test proves that the first test is not trustworthy.[6] *See, e.g., Paroby v. Godek,* 403 Pa.Super. 313, 588 A.2d 967 (1991) (first test was defective because lab could not reach a conclusion due to the lack of adequate blood sample). Once the movant proves that the first test was defective, then we weigh the parties' interests to determine whether a subsequent test is justified considering the Fourth Amendment privacy interests. Here, however, we do not reach the second level of inquiry because Cable has failed to demonstrate by a preponderance of the evidence that the first test is not trustworthy in the resolution of paternity.

**6.** Furthermore, although the test results may create a presumption of paternity, 23 Pa.C.S. § 4343(c), they are not conclusive and a party may nevertheless rebut this presumption.

Cable only presented unsubstantiated allegations that blood or tissue samples had been switched in Roche laboratories in other cases. She presented no evidence tending to prove that someone switched the samples here or that the results were otherwise unreliable. Nor did she provide evidence that the buccal swab method of obtaining DNA produces unreliable results.[7] Thus, pursuant to *DeAngelo*, she did not sustain her burden of proving, by a preponderance of the evidence, that the initial test was defective.

 Alternatively, Cable argues that she is entitled to an HLA blood test pursuant to *Mastromatteo*. In *Mastromatteo*, the Superior Court permitted a DNA blood test after an HLA blood grouping test without a showing that the HLA test was defective. The court held that because the DNA test would produce a more accurate determination of paternity, it constituted additional, more reliable evidence, and not merely duplicate evidence. *Id.* This case is not applicable here, however, because Cable failed to show that the HLA blood grouping test is a more dependable method of discovering paternity than the initial buccal swab DNA test. In fact, Dr. Harris testified that even if an HLA test included Anthou as the father, he would nevertheless conclude, based on the DNA tests, that Anthou was not the father. R.R. at 115a.

 Accordingly, regardless of the method of acquiring samples for the initial paternity test, a trial court may not order a subsequent, duplicate test unless the proponent proves, by a preponderance of the evidence, that the latest test was defective, unreliable or inaccurate. *DeAngelo*. Cable failed to meet her burden of proof.

7. Washington County was the first Pennsylvania County to adopt the buccal swab method of obtaining DNA samples for paternity testing and we are unaware of any other county in Pennsylvania that exclusively employs the same method. Dr. Harris testified that buccal swabs have been used experimentally since 1982, however, it was not until 1993 that Roche secured its first major project using buccal swabs for DNA paternity testing. That contract was with the state of Arkansas. R.R. at 121a. Although this is a relatively new method of obtaining tissue samples, there is no evidence in this record tending to prove that it is more susceptible to tainting or faulty results than blood testing.

562

We affirm the Order of the Superior Court denying subsequent paternity testing and remanding for further proceedings consistent with this Opinion.