J-A27020-18

2019 PA Super 33

| H.Z. | : | IN THE SUPERIOR COURT |
| | : | OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| M.B. | : | |
| | : | |
| Appellant | : | No. 1809 EDA 2018 |

Appeal from the Order Entered March 16, 2018
In the Court of Common Pleas of Montgomery County
Civil Division at No: 2010-18179

BEFORE: BOWES, J., STABILE, J., and McLAUGHLIN, J.

OPINION BY STABILE, J.:                    **FILED FEBRUARY 08, 2019**

M.B. appeals from the order entered March 16, 2018, in the Court of Common Pleas of Montgomery County, which found that he is the father of J.Z. ("Child"), a male born in April 2005 to H.Z. ("Mother"). After review, we vacate and remand with instructions.

This matter has a lengthy and convoluted procedural history. M.B. and Mother are former coworkers. On March 3, 2005, shortly before Child's birth, Mother filed a request for paternity and child support in New York, where both parties resided at the time, alleging that M.B. was Child's father. The parties and Child underwent genetic testing, which excluded M.B. The parties entered into a stipulation on March 28, 2006, providing that Mother would discontinue her paternity and child support actions against M.B. with prejudice.

These events, however, did not end Mother's attempts to prove M.B.'s paternity. In approximately December 2008, Mother retained the services of

a private investigation firm to obtain a sample of M.B.'s DNA. Apparently, a private investigator followed M.B. to a Starbucks, where he retrieved M.B.'s discarded coffee cup from a trashcan and submitted it for genetic testing. This so-called "Starbucks test" indicated a probability of paternity of over ninety-nine percent. Accordingly, on November 18, 2009, Mother began a second paternity and child support action against M.B. in New Jersey, where she and Child had since relocated. Because New Jersey lacked personal jurisdiction over M.B., who had relocated to Pennsylvania, the parties entered into another stipulation on March 8, 2010, dismissing Mother's claims.

On May 17, 2010, Mother filed a third request for child support, this time in Montgomery County, Pennsylvania. M.B. responded by filing an emergency motion to dismiss/preliminary objections and stay of genetic testing on July 7, 2010. M.B. argued that, pursuant to the doctrine of *res judicata*, the trial court could not compel him to submit to an additional paternity test because Mother discontinued her paternity and child support claims against him in New York with prejudice. On August 3, 2010, Mother filed an answer asserting that the doctrine of *res judicata* did not apply.

Curiously, a hearing on this issue did not take place for nearly another five years, until June 10, 2015.[1, 2] Mother testified that she did not continue to pursue the matter because of financial limitations, but that she reached a fixed fee agreement with her attorney that allowed her to resume litigation after receiving notice that the case was at risk of dismissal due to inactivity. N.T., 6/10/15, at 48-51. On August 10, 2015, the trial court entered an order directing M.B. to submit to genetic testing. M.B. timely appealed to this Court, arguing once again that the doctrine of *res judicata* barred additional testing, among other things.[3] A prior panel of this Court affirmed on June 28, 2016, finding that M.B. and Mother discontinued the New York proceeding in violation of New York law and that the discontinuance did not bar Mother from filing the subsequent proceeding in Pennsylvania. *H.Z. v. M.B.*, 153 A.3d 1120 (Pa. Super. 2016) (unpublished memorandum).

On July 28, 2016, the parties and Child appeared at the Montgomery County Domestic Relations Office and submitted to genetic testing via buccal

_____

[1] On December 16, 2010, M.B. filed a motion *in limine* requesting that the trial court exclude the Starbucks test facilitated by Mother's private investigator, maintaining that it would be irrelevant and inadmissible during the hearing on M.B.'s emergency motion. The court granted the motion on May 29, 2015, and excluded the results of the test.

[2] Several different judges have presided over this case during its history. The Honorable Arthur R. Tilson has presided since March 2015.

[3] On September 4, 2015, this Court granted M.B.'s application to stay enforcement of the August 10, 2015 order pending appeal.

swab. However, because M.B.'s DNA sample was insufficient for testing, the parties and Child appeared again on August 30, 2016, and submitted to further testing. Despite Mother's protests, this consisted of only an additional buccal swab.[4] Like the previous paternity test in New York, the Montgomery County test excluded M.B. as Child's father.

Upon receiving the results of the Montgomery County test, counsel for M.B. wrote a letter to the trial court requesting that it dismiss the proceeding with prejudice.[5] On September 16, 2016, Mother filed a motion seeking an order denying M.B.'s request for dismissal. She further requested additional genetic testing in the form of buccal swab, blood, and hair follicle testing, and discovery as to any records relating to the Montgomery County test. Mother alleged irregularities in the collection of M.B.'s DNA samples. She also averred that the genetic profiles for M.B. listed in the New York, Montgomery County, and Starbucks test reports differed from one another, meaning that the DNA samples used in those tests could not have come from the same person. M.B. filed an answer on October 18, 2016, including counterclaims requesting that the court direct Mother to remove from the record certain exhibits attached to her motion, including notes and a report prepared by her proffered expert in

_____

[4] On August 23, 2016, Mother filed an emergency petition for special relief requesting additional testing of M.B., including buccal swab, blood, and hair follicle testing. The record does not contain an order disposing of this petition.

[5] The letter does not appear in the certified record but does appear in the reproduced record.

- 4 -

DNA testing procedures. M.B. also requested that the court sanction Mother for continuing to reference the Starbucks test and award him counsel fees. Mother filed an answer on November 4, 2016, along with new matter supplementing her initial motion. On December 9, 2016, M.B. filed a motion to strike Mother's new matter, arguing that Mother's attempt to supplement her initial motion was a violation of the Pennsylvania Rules of Civil Procedure. In response to M.B.'s motion to strike, on December 21, 2016, Mother filed a praecipe to withdraw her new matter, as well as an amended version of her initial motion. M.B. then filed an amended motion to strike on January 17, 2017, maintaining that Mother was continuing to make improper references to the expert notes and report, as well as the Starbucks test. Mother filed an answer to M.B.'s amended motion to strike on February 6, 2017.

The trial court commenced a hearing on December 15, 2017.[6] The court first heard the testimony of Mother, who spoke at length concerning the July 28, 2016 and August 30, 2016 buccal swab testing. N.T., 12/25/17, at 56-69. Mother then presented the testimony of Montgomery County Domestic Relations Office intake coordinator, and backup paternity coordinator, Jessica Tomaselli, who conducted the buccal swab testing on July 28, 2016, and the testimony of paternity coordinator, Shannon King, who conducted the testing on August 30, 2016. The witnesses testified concerning the procedures they

---

[6] Counsel for M.B. made an oral motion to dismiss at the start of the hearing. N.T., 12/15/17, at 9, 32, 40.

used to conduct the testing. *Id.* at 88-97, 106-09, 137-40, 144-47, 154-56. Ms. Tomaselli stated that she had conducted over three hundred collections of DNA samples in her career, while Ms. King stated that she had conducted thousands of collections of samples. *Id.* at 99, 149. Notably, both witnesses testified that never before had a DNA sample they collected been insufficient for testing. *Id.* at 112, 135, 146-47. Finally, Mother presented the testimony of Marshall Schreibstein, Esquire, whom she retained to observe the August 30, 2016 testing. *Id.* at 114-24.

Next, M.B. presented the testimony of Debra Davis, Ph.D., lab director at DNA Diagnostics Center, via telephone. DNA Diagnostics Center analyzed the DNA samples collected by Ms. Tomaselli and Ms. King, and produced the report indicating that M.B. is not Child's father. Dr. Davis testified concerning the protocols surrounding the lab's receipt and testing of the DNA samples. *Id.* at 164-93. She stated that she found no evidence of tampering prior to receipt of the samples and no problems with their chain of custody. *Id.* at 165-66, 190-91. Importantly, she confirmed that M.B.'s buccal swab DNA sample from July 28, 2016 had degraded and was insufficient for testing because it exhibited "significant allele dropout and potential contamination[.]" *Id.* at 187. She could not provide a conclusion as to why the sample had degraded, but noted that the most common explanation would be "heat or bacteria or fungus growth," which could occur if the swab used to conduct the testing was wet at the time the person collecting the sample sent it to the lab.

*Id.* at 188. Concerning the presence of potential contamination, she stated, "[W]e are seeing a couple of pull up peeks . . . . It could be a high background or it could be contamination from an unknown source. Clearly, it does not appear to be a clear second proof file, but there's some unexplainable artifacts and peeks in the testing." *Id.* at 189. She noted that her lab conducts DNA testing for approximately twenty states and "occasionally" receives degraded samples. *Id.* at 189, 195.

At the beginning and at the conclusion of the hearing, the trial court indicated that it would coordinate with the parties to schedule an additional two days of testimony. *Id.* at 6-8, 208-09. The parties interrupted the testimony of Ms. King, Montgomery County's paternity coordinator, to call Dr. Davis at a prearranged time and her testimony remained incomplete. In addition, both parties intended to call experts concerning the validity of the Montgomery County test.

On December 18, 2017, the trial court entered an order continuing the remainder of the hearing until "a date to be announced." Order, 12/18/17.[7] However, on March 16, 2018, before the conclusion of the hearing, the court entered an order concluding that M.B. is Child's father and that the Domestic Relations Office would determine a child support award. M.B. filed a motion to vacate and/or for reconsideration on April 6, 2018. M.B. requested that the

---

[7] The trial court entered an amended order the following day saying the same thing.

court schedule the remainder of the hearing that began on December 15, 2017. In the alternative, he requested that the court recuse itself, or that it certify the matter as permissibly appealable pursuant to 42 Pa.C.S.A. § 702. M.B. filed an application to certify question for interlocutory appeal on April 12, 2018. The court granted M.B.'s application and entered an order on April 16, 2018, certifying the March 16, 2018 order as permissibly appealable.[8] M.B. filed an emergency application to stay the March 16, 2018 order pending appeal on April 23, 2018. The court granted M.B.'s application on April 30, 2018.

M.B. then filed a petition for permission to appeal in this Court on May 14, 2018. Mother filed an answer on June 5, 2018. This Court granted M.B. permission to appeal on June 27, 2018. On June 28, 2018, the trial court ordered M.B. to file a concise statement of errors complained of on appeal within twenty-one days, and M.B. timely complied by filing a concise statement on July 6, 2018.

M.B. presents the following questions for our review.

1. Must a trial court dismiss a paternity/child support action as a matter of law under Pa. R.C.P. 1910.15, 23 Pa. C.S. § 5104, and 23 Pa.C.S. § 4343 after two court–ordered genetic tests excluded [M.B.] as the father?

2. Did the trial court err as a matter of law in denying M.B.'s motion to dismiss and holding a hearing to determine whether a

---

[8] In his brief, M.B. indicates that he also requested a writ of mandamus in the Pennsylvania Supreme Court directing the trial court to complete the hearing. M.B.'s Brief at 16 n.3. The court denied M.B.'s request on May 11, 2018.

fourth buccal swab search and genetic test should be performed when a fourth buccal swab search would have violated 23 Pa.C.S. § 4343 and [M.B.'s] Fourth Amendment rights?

3. Did the trial court err as a matter of law or abuse its discretion in concluding that M.B. was the father of [Mother's] minor child when (1) two court-ordered genetic tests revealed that there was a 0% probability that M.B. was the child's father; (2) the only "test" reaching a contrary result had been precluded from evidence by the court's order granting [M.B.'s] motion in limine; and (3) there was no evidence that the most recent genetic test was inaccurate, unreliable, improperly conducted, or incorrectly interpreted?

M.B.'s Brief at 4-5.

We review paternity determinations pursuant to an abuse of discretion standard of review. *D.M. v. V.B.*, 87 A.3d 323, 328 (Pa. Super. 2014). In addition, M.B.'s claims require us to interpret the relevant statutory authority and our Rules of Civil Procedure. Our standard of review when doing so is *de novo* and our scope of review is plenary. *In the Interest of J.M.*, 166 A.3d 408, 416 (Pa. Super. 2017).

In his first claim, M.B. argues that he was entitled to dismissal of this action as a matter of law because the Montgomery County test excluded him as Child's father. M.B. directs our attention to the Pennsylvania Rules of Civil Procedure as well as to two statutory provisions. He focuses his argument first on the Uniform Act on Blood Tests to Determine Paternity, which he maintains eliminates any discretion on the part of the trial court and requires dismissal when genetic testing excludes a putative father. M.B.'s Brief at 24-29. The Act provides as follows, in relevant part:

**(a) Short title of section.--**This section shall be known and may be cited as the Uniform Act on Blood Tests to Determine Paternity.

**(b) Scope of section.—**

> **(1) Civil matters.--**This section shall apply to all civil matters.

\*\*\*

**(c) Authority for test.--**In any matter subject to this section in which paternity, parentage or identity of a child is a relevant fact, the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests.  If any party refuses to submit to the tests, the court may resolve the question of paternity, parentage or identity of a child against the party or enforce its order if the rights of others and the interests of justice so require.

**(d) Selection of experts.--**The tests shall be made by experts qualified as examiners of blood types, who shall be appointed by the court.  The experts shall be called by the court as witnesses to testify to their findings and shall be subject to cross-examination by the parties.  Any party or person at whose suggestion the tests have been ordered may demand that other experts qualified as examiners of blood types perform independent tests under order of court, the results of which may be offered in evidence.  The number and qualifications of experts shall be determined by the court.

\*\*\*

**(f) Effect of test results.--**If the court finds that the conclusions of all the experts as disclosed by the evidence based upon the

- 10 -

tests are that the alleged father is not the father of the child, the question of paternity, parentage or identity of a child shall be resolved accordingly. If the experts disagree in their findings or conclusions, the question shall be submitted upon all the evidence.

\*\*\*

23 Pa.C.S.A. § 5104.

We conclude that Section 5104 does not control the outcome of this case. Clearly, that section applies to findings of paternity established via blood testing. No blood testing took place in the instant matter. The testing that excluded M.B. as Child's father consisted entirely of buccal swab testing and this Court is not empowered to bend or change the language of the statute to accommodate M.B.'s desired result. While M.B. claims repeatedly in his brief that Section 5104 applies to all forms of genetic testing, and not just blood testing, he fails to cite any authority in support of that proposition. Thus, this portion of M.B.'s first claim fails.[9]

M.B. next directs our attention to Rule of Civil Procedure 1910.15(b)(3) and (d)(4). Focusing on the language of Rule 1910.15(b)(3), M.B. maintains

_____

[9] In fact, even applying Section 5104 to all forms of genetic testing, it does not require dismissal as a matter of law in the event of a test excluding the alleged father. The section provides that, following such a test, the parties have the option of cross-examining the experts who conducted the test and that any party "or person at whose suggestion the tests have been ordered" may demand independent testing by other experts. 23 Pa.C.S.A. § 5104(d). In addition, as noted below, case law provides that the parties must have the opportunity to show that the test was unreliable by a preponderance of the evidence.

that a hearing on the issue of paternity could only occur in this matter if the results of a genetic test did not indicate an exclusion. M.B.'s Brief at 29-31. Because the results of the Montgomery County test excluded M.B., he argues that the subsection required the trial court to grant his motion to dismiss. *Id.* As for Rule 1910.15(d)(4), M.B. argues that the language of that subsection does not allow for a hearing to occur if a genetic test resolves the issue of paternity. *Id.* at 31-33. He insists that the Montgomery County test resolved the issue of paternity such that the portion of the Rule providing for a hearing did not apply. *Id.* The Rule provides as follows, in relevant part.

**Rule 1910.15. Paternity.**

\*\*\*

**(b) Genetic Testing.** If the defendant appears but does not execute an acknowledgment of paternity at the conference:

(1) The court shall enter an order directing the parties to appear for genetic testing. The order must advise the defendant that his failure to appear for the testing will result in entry of an order finding that he is the father of the child. The order must also advise the plaintiff that her failure to appear for testing may result in sanctions, including entry of an order dismissing the paternity action without prejudice.

(2) The conference officer shall advise and provide written notice to the parties that they may enter into a written stipulation whereby both agree to submit to genetic testing for the purpose of resolving finally the issue of paternity. If the test results indicate a 99% or higher probability of paternity, the defendant shall be stipulated to be the biological father of the child and the case referred for a child support conference. If the test results

indicate an exclusion, the action shall be dismissed. The written stipulation constitutes a waiver of the right to a hearing on the genetic testing or trial on the issue of paternity.

(3) The conference officer shall advise and provide written notice to the parties that if they do not enter into a written stipulation and the test results do not indicate an exclusion, there will be a hearing regarding genetic testing or trial before a judge without a jury on the issue of paternity in accordance with the procedures set forth in subdivision (d) of this Rule.

\*\*\*

**(d) Post-Testing Procedures.**

(1) The results of the genetic tests shall be provided in writing to counsel for the parties or, if unrepresented, to the parties themselves.

(2) If the results of the genetic tests resolve the issue of paternity pursuant to the stipulation of the parties, a paternity order shall be entered and served on the parties. If the defendant is excluded, the action shall be dismissed. If the defendant is stipulated to be the biological father, the action shall proceed as in other actions for support.

(3) If the results of the genetic tests do not resolve the issue of paternity pursuant to the stipulation of the parties but the test results indicate a 99% or more probability of paternity, the court shall issue a rule against the defendant to show cause why an order should not be entered finding him to be the father. The rule shall advise the defendant that pursuant to 23 Pa.C.S. § 4343 his defense is limited to a showing by clear and convincing evidence that the results of the genetic tests are not reliable. The rule shall direct that an answer be filed within 20 days after service of the rule on the defendant. The answer shall state the material facts

which constitute this defense. Any allegation of fact which does not appear of record must be verified.

If an answer is not timely filed, the court shall enter an order finding paternity and refer the action to conference and hearing as in other actions for support. If an answer is filed raising a disputed issue of material fact relating to the reliability of the genetic testing, the case shall be listed promptly for expedited hearing before a judge. The burden of proof at the hearing is on the defendant and is limited to proof by clear and convincing evidence that the results of the genetic tests are not reliable.

(4) If the results of the genetic tests do not resolve the issue of paternity and the test results indicate less than a 99% probability of paternity, the case shall be promptly listed for expedited trial before a judge.

(5) If, after a hearing or trial, the decision is for the defendant on the issue of paternity, a final order shall be entered by the court dismissing the action as to the child. If the decision is against the defendant on the issue of paternity, an interlocutory order shall be entered by the court finding paternity. The court may enter an interim order for child support at that time and shall refer the action to conference and hearing as in other actions for support.

***

Pa.R.C.P. 1910.15.

Once again, we find that this provision did not entitle M.B. to dismissal as a matter of law. While Rule 1910.15(b)(3) provides that the conference officer must inform the parties that a hearing will occur if they do not enter into a written stipulation and test results do not indicate an exclusion, it does not follow that a hearing may occur only under the circumstances described

in that subsection. Notably, the Rule indicates that the parties have "the right to a hearing on the genetic testing or trial on the issue of paternity" which they may waive by way of the written stipulation. Pa.R.C.P. 1910.15(b)(2). Also instructive is the comment to Rule 1910.15, which provides six possible methods for establishing paternity. The comment does not provide that a genetic test by itself is sufficient to establish paternity. Instead, it provides that a "stipulation of the parties to be bound by the genetic test results" and "a hearing regarding the reliability of genetic testing or a trial before a judge on the issue of paternity upon receipt of the test results" are permissible. Pa.R.C.P. 1910.15, Comment.

We also reject M.B.'s interpretation of Rule 1910.15(d)(4). A contextual reading of that subsection demonstrates that the language "resolve the issue of paternity" is in reference to the option of entering into a written stipulation mentioned earlier in the Rule. For example, subsection (b)(2) provides that the parties may enter into a stipulation "for the purpose of resolving finally the issue of paternity." Pa.R.C.P. 1910.15(b)(2). Subsection (d)(2) sets forth the outcome if "the results of the genetic tests resolve the issue of paternity pursuant to the stipulation of the parties[.]" Pa.R.C.P. 1910.15(d)(2). Finally, subsection (d)(3) sets forth the outcome if "the results of the genetic tests do not resolve the issue of paternity pursuant to the stipulation of the parties but the test results indicate a 99% or more probability of paternity[.]" Pa.R.C.P. 1910.15(d)(3). In light of these provisions, we find that Rule 1910.15(d)(4)

sets forth the outcome when "the results of the genetic tests do not resolve the issue of paternity" pursuant to the stipulation of the parties and "the test results indicate less than a 99% probability of paternity," as is the case in the instant matter. Pa.R.C.P. 1910.15(d)(4). In this way, the Rule provides a clear course of conduct addressing every possible result of the genetic testing. The second portion of M.B.'s first claim does not entitle him to relief.

The next statutory provision on which M.B. relies is 23 Pa.C.S.A. § 4343. M.B. acknowledges that Section 4343 permits a party to request an additional genetic test if he or she disputes the results of an initial test, but insists that this provision, when read in conjunction with Section 5104 and Rule 1910.15, "require[s] the dismissal of any action where a defendant is excluded from paternity." M.B.'s Brief at 33-34. M.B. directs our attention to two cases, **_DeAngelo v. Murray_**, 638 A.2d 966 (Pa. 1994), and **_Cable v. Anthou_**, 699 A.2d 722 (Pa. 1997), for the proposition that the trial court could not order any further testing. M.B.'s Brief at 34-37. The statute provides as follows, in relevant part:

> **(a) Determination.--**Where the paternity of a child born out of wedlock is disputed, the determination of paternity shall be made by the court in a civil action without a jury. A putative father may not be prohibited from initiating a civil action to establish paternity. The burden of proof shall be by a preponderance of the evidence. Bills for pregnancy, childbirth, postnatal care related to the pregnancy and genetic testing are admissible as evidence without requiring third-party foundation testimony and shall constitute prima facie evidence of amounts incurred for such services or for testing on behalf of the child. If there is clear and

- 16 -

convincing evidence of paternity on the basis of genetic tests or other evidence, the court shall upon motion of a party issue a temporary order of support pending the judicial resolution of a dispute regarding paternity. The Supreme Court shall provide by general rule for entry of a default order establishing paternity upon a showing of service of process on the defendant and a subsequent failure to appear for scheduled genetic testing.

\*\*\*

**(c) Genetic tests.—**

(1) Upon the request of any party to an action to establish paternity, supported by a sworn statement from the party, the court or domestic relations section shall require the child and the parties to submit to genetic tests. The domestic relations section shall obtain an additional genetic test upon the request and advance payment by any party who contests the initial test.

(2) Genetic test results indicating a 99% or greater probability that the alleged father is the father of the child shall create a presumption of paternity which may be rebutted only by clear and convincing evidence that the results of the genetic tests are not reliable in that particular case.

(3) To ensure the integrity of the specimen and that the proper chain of custody has been maintained, the genetic tests of the biological mother, the child or children in question and the alleged father should be conducted by an established genetic-testing laboratory in the course of its regularly conducted business activity, and certified records should be issued. The certified records shall be admissible into

> evidence without further foundation, authentication or proof of accuracy if no objection is made within ten days prior to trial. The laboratory must be certified by either the American Association of Blood Banks or the American Association for Histocompatibility and Immunogenetics.

\*\*\*

23 Pa.C.S.A. § 4343.

This provision only lends further support to our conclusion that M.B. is not entitled to dismissal of Mother's action as a matter of law. Section 4343(a) provides that a determination of paternity must be made "by the court in a civil action without a jury." 23 Pa.C.S.A. § 4343(a). It does not provide that genetic tests are conclusive of the issue of paternity, but only that such tests serve as clear and convincing evidence to establish a temporary support order "pending the judicial resolution of a dispute regarding paternity." *Id.* As for Section 4343(c), it provides that the "domestic relations section shall obtain an additional genetic test upon the request and advance payment by any party who contests the initial test." 23 Pa.C.S.A. § 4343(c)(1). Accordingly, rather than buttress M.B.'s claim that a negative paternity test requires dismissal, the statute provides that any party may request an additional genetic test as a matter of right.[10] *Id.*

---

[10] To be clear, the ability to obtain an additional genetic test as a matter of right applies only to an "initial test" pursuant to 23 Pa.C.S.A. § 4343(c)(1).

While M.B. insists that we should read Section 4343 in conjunction with Section 5104 and Rule 1910.15 to preclude further testing, this argument runs contrary to our Rules of Statutory Construction.  It is well settled that courts interpreting a statute must strive to give effect to every one of its provisions. *In re Adoption of J.A.S.*, 939 A.2d 403, 405-06 (Pa. Super. 2007), *appeal denied*, 954 A.2d 577 (Pa. 2008) (quoting *Cimino v. Valley Family Medicine*, 912 A.2d 851, 853 (Pa. Super. 2006), *appeal denied*, 921 A.2d 494 (Pa. 2007)) ("We also must construe a statute in such a way as to give effect to all its provisions, if possible, thereby avoiding the need to label any provision as mere surplusage.")).  M.B.'s suggested interpretation would force us to write the second sentence of Section 4343(c)(1) completely out of existence.  Further, we observe that his interpretation would produce a clearly inequitable and unreasonable result.  *Id.* at 406 (quoting *Commonwealth v. Diakatos*, 708 A.2d 510, 512 (Pa. Super. 1998)) ("[I]t is presumed that the legislature did not intend an absurd or unreasonable result.  In this regard, we ... are permitted to examine the practical consequences of a particular interpretation.")).  If we were to accept M.B.'s argument, we would be holding that a mother could never challenge the results of a negative paternity test,

Under the unique circumstances of this case, where a prior panel of this Court concluded that the parties discontinued the New York proceedings improperly, and further concluded that those proceedings were not binding on the parties, thereby permitting Mother to commence a new proceeding in Pennsylvania, we interpret the phrase "initial test" to refer to the test in Montgomery County.

- 19 -

even if she possesses evidence demonstrating that the test was inaccurate. Such a system would encourage attempts by putative fathers to manipulate test results because those results would be utterly unassailable. Conversely, putative fathers would be entitled to all manner of protections in the event of a positive paternity test. This cannot be what our Supreme Court and General Assembly intended when they promulgated the relevant Rule and statutory provisions.

As for the case law M.B. cites in his brief, our Supreme Court decided both **DeAngelo** and **Cable** prior to the amendment to Section 4343, effective January 1, 1998, which added the language allowing a party to challenge an initial genetic test as a matter of right. They were not cases interpreting the relevant statutory language and are therefore not binding on us here. Even if we were to agree with M.B. that **DeAngelo** and **Cable** do apply in the instant matter, both cases belie his argument that he was entitled to dismissal as a matter of law. As M.B. appears to acknowledge, those cases permit a party to demonstrate that an initial genetic test was unreliable. **See DeAngelo**, 638 A.2d at 968 (explaining that additional blood testing to determine paternity "will not be permitted merely on the basis that different tests reach different results. Rather, this Court requires a showing that the latest test administered was defectively performed"); **Cable**, 699 A.2d at 726 (explaining that the results of an initial buccal swab test will "remain viable and binding in the determination of paternity unless and until the proponent of the second

test proves that the first test is not trustworthy") (footnote omitted).
Accordingly, we reject M.B.'s first claim.

In his second claim, M.B. argues that the trial court erred as a matter of law by declining to dismiss this case on the basis that any further genetic testing would be a violation of his Fourth Amendment rights. M.B.'s argument is brief and he supports it primarily with a discussion of **Cable**, **supra**.

M.B. has waived this claim by raising it for the first time on appeal. **See** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). While M.B. requested dismissal of Mother's case prior to and at the beginning of the hearing on December 15, 2017, he acknowledges that he did not do so based on Constitutional grounds. **See** M.B.'s Reply Brief at 14. Instead, he argues that his request for dismissal, premised on Section 4343 and unspecified case law, was "sufficiently broad" to encompass a Constitutional challenge. **Id.** We disagree. The purpose of Rule 302(a) is to provide the trial court the opportunity to address and correct any potential errors. **See In re F.C. III**, 2 A.3d 1201, 1212 (Pa. 2010) (The Rule 302(a) waiver requirement "ensure[s] that the trial court that initially hears a dispute has had an opportunity to consider the issue. This jurisprudential mandate is also grounded upon the principle that a trial court . . . must be given the opportunity to correct its errors as early as possible.") (citations omitted). Nothing about M.B.'s request for dismissal would have alerted the court to any purported Constitutional problems.

Nonetheless, even if we were to reach the merits of M.B.'s claim, we would not find that it entitles him to relief. Even applying **Cable** to the matter at bar, that case stands for the proposition that a party may be entitled to additional testing if he or she proves by a preponderance of the evidence that the first test was unreliable.[11] The case does not hold, or even suggest, that a trial court must grant dismissal as a matter of law once an initial test is completed.

In his third and final claim, M.B. argues that the trial court abused its discretion by finding he is Child's father based on excluded evidence and contrary to the Montgomery County test results. M.B. contends that the court relied impermissibly on the results of the Starbucks test despite entering an order excluding it, and on Mother's testimony during the prior hearing on June 10, 2015, that he and Child resemble each other. M.B.'s Brief at 45-47. He also defends the integrity of the buccal swab testing conducted on August 30, 2016, and asserts there are "no facts to support a conclusion" that the results were unreliable. *Id.* at 41-45.

_____

[11] In **Cable**, our Supreme Court set forth a two-step process for determining when additional testing is permissible. *Id.*, 699 A.2d at 726. The Court explained that the party requesting additional testing must show by a preponderance of the evidence that the first test was unreliable or defective in some way. *Id.* Then, the trial court must "weigh the parties' interests to determine whether a subsequent test is justified considering the Fourth Amendment privacy interests." *Id.*

We agree with M.B., to an extent. As we discussed above, the trial court began a hearing on December 15, 2017, ostensibly to address M.B.'s request for dismissal of the action and Mother's request for additional genetic testing. The court made it only part way through the hearing, stating that it intended to complete the proceedings on a future date. Then, rather than complete the hearing and address the issues before it, the court entered an order concluding that M.B. is Child's father. In reaching this conclusion, the court stated that it relied on three paternity tests, suggesting that it considered the excluded Starbucks test. ***See*** Order, 3/16/18 (indicating that the court "evaluated all of the evidence produced, including . . . the results of the three (3) DNA tests"). The court's decision to enter an order before hearing all of the relevant evidence, and based in part on evidence that it excluded as unreliable, was an abuse of discretion. ***See In the Interest of H.K.***, 172 A.3d 71, 80 (Pa. Super. 2017) ("[T]rial courts may not engage in the capricious disregard of competent and credible evidence. Likewise, a court cannot simply refuse to hear evidence, without ruling on whether that evidence is competent or credible, and then conclude that a party has failed to meet its burden of proof.") (citations omitted).

Nonetheless, it does not follow that the trial court should have dismissed this matter in favor of M.B., and we do not direct the court to do so. Section 4343 provides that Mother is entitled to an additional genetic test at her own expense as a matter of right. Therefore, we remand for additional testing.

The parties may enter into a stipulation that this additional testing will resolve forever the issue of Child's paternity. If they do not, the subsequent procedure will depend on the results of the additional testing. If the additional testing indicates that M.B. is Child's father, the court and the parties may proceed to a hearing on the reliability of the testing as set forth in Rule 1910.15(d)(3). If the testing excludes M.B. as Child's father, the court and the parties may proceed to a trial on the issue of paternity as set forth in Rule 1910.15(d)(4). Applying the principles set forth in **Cable**, if either M.B. or Mother requests even further testing, the court must grant him or her the opportunity to demonstrate that the prior testing was unreliable. If the court agrees that the prior testing was unreliable, it must consider the parties' Fourth Amendment privacy interests before ruling on whether to grant further testing.[12]

_____

[12] As a final note, our review of Mother's pleadings and the transcript of the hearing on December 15, 2017, reveals possible concerns regarding the validity of the Montgomery County test. As Mother argues, the genetic profiles listed for M.B. on the New York and Montgomery County test results appear inconsistent. Furthermore, Ms. Tomaselli and Ms. King testified that they had both collected many buccal swab DNA samples in their careers and that never before had a sample they collected been insufficient for testing. Dr. Davis testified that one possible reason M.B.'s initial DNA sample was insufficient for testing was contamination. While Dr. Davis explained that her lab receives degraded DNA samples occasionally, she further stated that the lab conducts paternity testing for approximately twenty states. This may suggest that Dr. Davis receives a great multitude of DNA samples and that degraded samples are rare. Because this Court is composed of judges, rather than geneticists, we are unable to reach any conclusion as to the significance of these facts. However, this evidence at least questions the reliability of the DNA samples provided during the buccal swab testing. Thus, for the sake of putting any

Based on the foregoing, we conclude that the trial court committed an abuse of discretion by finding that M.B. is Child's father. We therefore vacate the March 16, 2018 order, and remand for further proceedings consistent with this Opinion, including additional genetic testing pursuant to Section 4343(c)(1).

Order vacated. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/8/19

---

such concerns to rest, it may be advisable for the trial court to order the parties to submit to alternative or additional forms of paternity testing.