**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| STEVEN M. SITLER, | : | No. 37 MAP 2024 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court at No. 1402 MDA |
| | : | 2023, entered on March 5, 2024, |
| v. | : | Affirming the Order of the |
| | : | Columbia/Montour County Court of |
| | : | Common Pleas, Civil Division, at No. |
| ALEXAS JONES, | : | 2023-MV-22-MV entered on |
| | : | September 11, 2023 |
| Appellee | : | |
| | : | SUBMITTED: July 31, 2024 |

## OPINION

**JUSTICE WECHT**                                          **DECIDED: April 25, 2025**

The presumption of paternity dictates that, regardless of biology, the child of a married woman is the child of her husband. At issue in this case is whether this longstanding principle of the common law retains force in Pennsylvania and, if so, how it is applied in our courts.

On March 25, 2022, Alexas Jones married B.J. ("Husband"), with whom she already had a child. Jones remains married to Husband, and the two have never separated. In May 2023, Jones gave birth to a second child ("Child"). Steven Sitler sought custody of Child, asserting that he is Child's biological father. Sitler brought an action seeking to compel genetic testing and establish paternity.[1] On August 21, 2023, the trial court held a hearing, which revealed the following facts.

---

[1] Sitler sought to establish paternity pursuant to 23 Pa.C.S. § 4343. That section provides for paternity determinations by genetic testing only for children born out of
(continued…)

Around the time of Child's conception, Jones had sex with both Husband and Sitler. In October 2022, Jones notified Sitler that she was pregnant, and that she believed that he might be the father. Sitler replied that he "wanted nothing to do" with the then unborn child.[2] Within a week, Sitler changed his mind. He reached out to Jones and asserted that he wanted to have a relationship with the then unborn child. On May 17, 2023, just over a week after Child was born, Sitler filed an action for custody. Meanwhile, Jones and Husband have been caring for Child together since Child's birth. Husband's name appears on Child's birth certificate, and the couple has held Child out as Husband's to "everybody," including their friends, family members, and co-workers.[3] At the August 2023 hearing, Husband testified that he would continue to love and care for Child regardless of whether testing reveals that he is Child's biological father.

On these facts, the trial court denied Sitler's request for genetic testing.[4] The court found that both the presumption of paternity and paternity by estoppel applied, thus precluding genetic testing. The court determined that the presumption applied because Child is part of an intact family unit: Jones and Husband were married at the time of conception, and they remain married. The two continue to live with and care for Child, along with their older child. The trial court found that Sitler had not presented clear and

---

wedlock. See 23 Pa.C.S. § 4343(a); Cable v. Anthou, 699 A.2d 722, 724 (Pa. 1997). Section 4343 does not apply to children born in wedlock. Moreover, Section 4343 pertains to genetic testing for purposes of determining paternity in child support actions, not in actions for child custody. See generally 23 Pa.C.S. §§ 4301-96. Though Sitler incorrectly cites Section 4343 as the source of his cause of action, a determination of parentage is a necessary predicate to standing in custody actions. 23 Pa.C.S. § 5324. Hence, Sitler's claim is cognizable.

[2] Trial Court Opinion and Order, 9/11/2023 ("TCO 1"), at 2.

[3] Id.

[4] No testing has been performed, and the identity of the biological father has not been scientifically determined.

convincing evidence of Husband's sterility, impotence, or non-access to Jones, and hence had failed to overcome the presumption. The trial court concluded that the intactness of the family rendered the presumption of paternity irrebuttable.[5]

The court determined that paternity by estoppel also applied, for two reasons: (1) Sitler had "flip-flopped" with respect to his intentions, first stating that he did not want a relationship with Child, but later seeking custody; and (2) Husband and Child had become emotionally bonded during the first four months of Child's life.[6] Based on the latter finding, the trial court held that the law prohibits "pulling the carpet out from under" Child by upsetting the existing parent-child relationship.[7] The court deemed this concern relevant notwithstanding that Child was still an infant, and opined that "emotional bonding begins at birth and becomes very strong, very quickly."[8] The trial court reasoned that "a relationship of father and child [had] been established between Husband and Child due to the emotional bonding and the stability of the family unit," and that maintaining this relationship serves Child's best interests.[9]

Sitler appealed from the dismissal of his complaint. He challenged the trial court's reliance upon the presumption of paternity and paternity by estoppel. Sitler asserted that the presumption of paternity is no longer sound policy, because the Commonwealth's interest in protecting the family unit is outweighed by the interest of the child in knowing his or her parent's identity.[10]

---

[5]   Opinion per Pa.R.A.P. 1925, 10/10/2023 ("TCO 2"), at 2.

[6]   TCO 1, at 4.

[7]   *Id.* at 5.

[8]   *Id.*

[9]   TCO 2, at 1.

[10]  Concise Statement of Errors Claimed on Appeal, ¶ 7(a)-(g) (R.R. at 25a-26a).

The Superior Court affirmed, basing its decision exclusively on the presumption of paternity.[11] Sitler maintained in that court that applying the presumption did not further the underlying policy goal of preserving marriages here, because the marriage in this case had proven its strength in overcoming an affair, and because of Husband's testimony that he would continue to care for Child even in the event that Child was not his biological offspring. Sitler also argued that Jones' own admission to him that she believed Sitler was the biological father should rebut the presumption of paternity.

The Superior Court deemed these arguments unavailing. The intermediate panel cited this Court's very recent restatement of the presumption in *B.C. v. C.P.*[12] The *B.C.* Court explained that the presumption, though no longer premised on children's need for "legitimacy," continues to serve the preservation of marriage and the family unit. Traditionally, the presumption could be overcome only by clear and convincing evidence either that the husband did not have access to the wife when the child was conceived or that the husband was impotent or sterile. In recent decades, we have held that the presumption applies only to an intact marriage[13]—a circumstance that nonetheless renders the presumption irrebuttable.[14] The Superior Court observed that the married couple in *B.C.*, like Jones and her husband here, had overcome an affair and managed to stay together. On that basis, this Court in *B.C.* deemed the marriage to be intact and afforded it the protection of the presumption. The Superior Court held that the

---

[11] *Sitler v. Jones*, 312 A.3d 334 (Pa. Super. 2024). The Superior Court held that, because the presumption applied, the doctrine of paternity by estoppel did not. *Id.* at 340 n.5.

[12] 310 A.3d 721 (Pa. 2024).

[13] *Id.* at 731 (citing *Brinkley v. King*, 701 A.2d 176, 180-81 (Pa. 1997) (plurality)).

[14] *Id.* at 735.

presumption therefore applies in this case as well, and that the presumption is irrebuttable.[15]

The Superior Court then turned to Sitler's claim that the presumption is no longer supported by public policy. Sitler argued that the presumption is ill-suited to the realities of the modern age, emphasizing the ease and accuracy of DNA testing by oral swab, and citing criticisms of the doctrine by various former Justices of this Court.[16] The Superior Court cited *B.C.*'s refusal to upset the presumption, and this Court's accompanying instruction that, unless and until we choose to abrogate the presumption in a case where the issue is properly preserved and developed, courts remain bound to apply it. Adhering to that directive, the Superior Court refused to set aside or otherwise alter the presumption of paternity.[17]

We accepted two issues in Sitler's appeal: first, whether, in contemporary society, the presumption of paternity has outlived its usefulness; and second, in the event that we choose to abridge the presumption of paternity, whether the Superior Court erred in failing to address the trial court's holding that paternity by estoppel also precludes genetic testing.[18]

---

[15]     *Sitler*, 312 A.3d at 339-40.

[16]     *See id.* at 340; *see also* Sitler's Brief, at 11-15.

[17]     *See Sitler*, 312 A.3d at 340-41.

[18]     *Sitler v. Jones*, 318 A.3d 758 (Pa. 2024) (*per curiam*). Based on pre-existing law, the Superior Court held that the presumption of paternity precluded DNA testing. It did not reach the question of estoppel. *Sitler*, 312 A.3d at 340 n.5. In light of our rulings today regarding the presumption, the Superior Court should consider on remand whether estoppel would preclude DNA testing in this case. Inasmuch as the Superior Court did not reach the issue, we do not address the merits of the trial court's estoppel ruling at this time.

This Court reviews a lower court's determination of paternity for an abuse of discretion.[19] Whether the lower courts properly applied our case law with respect to the presumption is a question of law, over which our standard of review is *de novo* and our scope of review plenary.[20]

To date, our General Assembly has not enacted any comprehensive statutory scheme to govern paternity determinations.[21] In the absence of legislative action, paternity law rests upon two principles that have developed at common law: the presumption of paternity and paternity by estoppel. Our decision today turns upon the first of these. The presumption of paternity dates back centuries, with roots in English precedent.[22] The presumption of paternity stands for the proposition that, when a child is born to a married woman, her husband is presumed to be the child's father.[23] The presumption rested originally on two policy rationales. First, the presumption sought to protect children from the social stigma and legal discrimination that accompanied a child's

---

[19]   *B.C.*, 310 A.3d at 729 n.7 (citing *H.Z. v. M.B.*, 204 A.3d 419, 425 (Pa. Super. 2019)).

[20]   *See id.* (citing *K.E.M. v. P.C.S.*, 38 A.3d 798, 803 (Pa. 2012)).

[21]   *See* Jacinta M. Testa*, Finishing Off Forced Fatherhood: Does It Really Matter If Blood or DNA Evidence Can Rebut the Presumption of Paternity?*, 108 PENN ST. L. REV. 1295, 1311 (2004). A bill seeking enactment of the Uniform Parentage Act was introduced last year. H.R. 350, 2023-2024 Gen. Assembly, Reg. Sess. (Pa. 2024). The Act has been adopted, in one form or another, in twenty-five states. *2017 Parentage Act, Enactment History*, UNIFORM LAW COMMISSION, https://www.uniformlaws.org/committees/community-home?CommunityKey=c4f37d2d-4d20-4be0-8256-22dd73af068f%20(last%20visited%20Apr.%203,%202019) (last visited Apr. 24, 2025).

[22]   *Commonwealth v. Shepherd*, 6 Binn. 283, 286 (Pa. 1814) (citing *Pendrell v. Pendrell*, 2 Stra. 925, 93 Eng. Rep. 495 (K.B. 1732)).

[23]   *B.C.*, 310 A.3d at 730.

status as "illegitimate."[24] This policy rationale was rendered obsolete in Pennsylvania when the General Assembly eliminated the legal distinction between "legitimate" and "illegitimate" children.[25] Second, the presumption of paternity served the goal of preserving marriages and family units.[26] Since the eclipse of legitimacy-based distinctions in the law, this latter rationale has been the sole pillar on which the presumption rests.

The presumption of paternity has been called "one of the strongest [presumptions] known to the law."[27] Traditionally, it could be overcome only by clear and convincing evidence that: (1) the presumed father lacked access to the mother at the time of conception; (2) the presumed father was impotent; or (3) the presumed father was sterile.[28]

---

[24] *See John M. v. Paula T.*, 571 A.2d 1380, 1383 n.2 (Pa. 1990); Jessica Feinberg, *Restructuring Rebuttal of the Marital Presumption for the Modern Era*, 104 MINN. L. REV. 243, 249-50 (2019) (noting the social stigma and legal consequences of being deemed "illegitimate"). Due to such concerns, the presumption was once known as the "presumption of legitimacy." *See John M.*, 571 A.2d at 1383 n.2.

[25] *See John M.*, 571 A.2d at 1386-87 (citing Act of June 17, 1971, P.L. 175, *as amended*, 48 P.S. § 167 (repealed)); 20 Pa.C.S. § 2107(c)(2).

[26] *B.C.*, 410 A.3d at 730; *see Brinkley*, 701 A.2d at 180 (plurality) ("The public policy in support of the presumption of paternity is the concern that marriages which function as family units should not be destroyed by disputes over the parentage of children conceived or born during the marriage."); *John M.*, 571 A.2d at 1386 ("The Commonwealth recognizes and seeks to protect [that] basic and foundational unit of society, the family, by the presumption that a child born to a woman while she is married is a child of the marriage.").

[27] *Cairgle v. Am. Radiator & Standard Sanitary Corp.*, 77 A.2d 439, 442 (Pa. 1951).

[28] *See B.C.*, 310 A.3d at 730. Older articulations of the rule dictated that the presumption could not be overcome except by proof of "the absence of the husband beyond the seas immediately prior to and during the whole period of gestation." *Cairgle*, 77 A.2d at 442. That formulation, however, was deemed "so contrary to human experience" that it gave way over time to the traditional set of rebuttals. *See id.* (citing *Shepherd*, 6 Binn. at 286).

In 1997, this Court reviewed the presumption of paternity in light of the increasing commonality of separation and divorce. The Court held that the presumption should apply only when doing so furthers the underlying goal of preserving marriages that serve as family units.[29] As such, the presumption applies only if the court determines that the marriage is intact at the time that the husband's paternity is challenged.[30] The fact that a married couple has experienced one or more periods of separation prior to commencement of a paternity action, while relevant, is not conclusive on the question of whether the marriage is intact.[31]

This Court has held that, if the presumption of paternity applies, courts may not order blood tests unless that presumption has been overcome.[32] In *John M. v. Paula T.*, a child had been born to a married woman. A man claiming to be the child's biological father sought custody, filed a motion seeking court-ordered blood testing of the husband. The putative ("alleged") father, John M., cited the Uniform Act on Blood Tests, which required courts, upon motion, to order the "mother, child, and alleged father" to submit to blood tests in an action to determine paternity.[33] The Act stated that the presumption of

---

[29]    *See Brinkley*, 701 A.2d at 181 (plurality). Although *Brinkley* was a plurality decision, a majority endorsed the principal holding: that the presumption should be limited to situations in which it serves the underlying policy of preserving families. *See Brinkley*, 701 A.2d at 190 (Newman, J., concurring and dissenting).

[30]    *B.C.*, 310 A.3d at 735.

[31]    *Id.* at 737.

[32]    *Jones v. Trojak*, 634 A.2d 201, 206 (Pa. 1993) (citing *John M.*, 571 A.2d 1380).

[33]    *John M.*, 571 A.2d at 1385 (citing 42 Pa.C.S. § 6133 (repealed 1990)). The Uniform Act on Blood Tests has existed in one form or another since 1951. *See B.C.*, 310 A.3d at 739 (Wecht, J., concurring); *Commonwealth ex rel. O'Brien v. O'Brien*, 136 A.2d 451, 453 (acknowledging apparent intent by the legislature to aid "blameless" defendants to support actions, who otherwise could not refute paternity except by "protestations of innocence") (Pa. 1957). The Act remains on the books, *see* 23 Pa.C.S. § 5104 (1990), but has not been amended to reflect scientific advances in genetic testing. *See B.C.*, 310 A.3d at 739-40 (Wecht, J., concurring); *see infra* nn. 37, 53, 57.

paternity was "overcome if . . . the tests show that the husband is not the father of the child."[34] This Court held that the Act did not give a putative father the right to compel the presumptive father (*i.e.*, the husband) to submit to testing.[35] Determining that the Act afforded no such right to putative fathers, this Court proceeded to consider whether denying that right violated John M.'s "procedural and substantive due process rights."[36] The Court concluded that it did not. This Court balanced the privacy rights of the presumed father and the Commonwealth's interest in preserving marriages on the one hand against the interest of the putative father in securing the test results on the other. The Court came down on the side of the Commonwealth.[37] As such, our precedent to

---

[34]     42 Pa.C.S. § 6137 (repealed 1990).

[35]     *John M.*, 571 A.2d at 1385. With the mother's consent, the putative father (John M.) already had obtained test results as to himself and the child. The tests revealed a 97.47 percent probability that John M. was the biological father. *See id.* at 1382.

[36]     *Id.* at 1385.

[37]     *Id.* at 1385-88. This Court has interpreted the holding in *John M.* to render the Uniform Act on Blood Tests substantially irrelevant. *See Trojak*, 634 A.2d at 206. Though it remains on the books, the Uniform Blood Tests Act has not been amended to account for modern DNA testing. Even now, the Act continues to provide as follows:

> In any matter subject to this section in which paternity, parentage or identity of a child is a relevant fact, the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to **blood tests**.

23 Pa.C.S. § 5104 (emphasis added).

The Dissent criticizes this Court's precedents prioritizing the common law presumption of paternity over the Uniform Blood Tests Act. The Dissent would overrule that line of cases and would invoke the Uniform Blood Tests Act as a basis to compel testing here. The Dissent concedes that the testing referred to in the Act—blood type testing—is not synonymous with modern DNA testing, *see* Diss. Op. at 11-12, but asserts nonetheless that the "public policy espoused in Section 5104[] is unambiguous," and insists that we should "enforc[e]" that policy, *see id.* at 12, 16. In pressing this argument, (continued…)

date has ordained that, if the marriage is intact, the presumption applies. Where the presumption applies, testing cannot be obtained unless and until the party seeking testing has rebutted the presumption.[38]

This Court has gone as far as to state that, where the marriage is intact, the presumption of paternity is irrebuttable.[39] In other words, the same condition that triggers the application of the presumption in the first place—an intact marriage—renders the presumption conclusive. This Court has restricted the applicability of the doctrine to a limited circumstance (intact marriage), while implicitly abandoning the old avenues for rebuttal (non-access to the wife, impotence, or sterility). As things stand, if the marriage

---

the Dissent attempts to stretch the statute well beyond its text in order to pave a path to DNA testing that the General Assembly has yet to create.

The Dissent also suggests that this Court has erroneously read the holding in *John M.* too broadly to foreclose the right of putative fathers to secure blood testing under the Act in every case. *See* Diss. Op. at 7-8. We need not explore the merits of this proposition. Assuming *arguendo* that this is correct—*i.e.*, that the Act entitles a putative father to compel blood testing of the mother or child, just not testing of the presumptive father—the Act is nonetheless obsolete. At best, such a rubric would afford putative fathers a right to blood type testing. A putative father still would not be entitled to the DNA testing sought by Sitler in this case.

To the extent that the Dissent suggests that we should interpret the "blood testing" permitted under the Act, *see* 23 Pa.C.S. § 5104(g), to include DNA testing via blood sample, as opposed to DNA testing via buccal swab, *see* Diss. Op. at 11, the remainder of the statutory text makes clear that the Act contemplates blood *type* testing—an outdated method of determining paternity that relies on comparing blood types, rather than on DNA analysis. *See infra* nn. 53, 57.

[38] This Court also requires that a party seeking testing first overcome the doctrine of paternity by estoppel. *See Trojak*, 634 A.2d at 206.

[39] *See Strauser v. Stahr*, 726 A.2d 1052, 1054 (Pa. 1999) ("[I]n one particular situation, no amount of evidence can overcome the presumption: where the family (mother, child, and husband/presumptive father) remains intact at the time that the husband's paternity is challenged, the presumption is irrebuttable."); *B.C. v. C.P.*, 310 A.3d at 735 ("[T]here is a single circumstance under which the presumption of paternity continues to apply, and, indeed, is irrebuttable—where there is an intact marriage to preserve.").

is intact, the presumption applies, and the presumption is rendered irrebuttable by virtue of the intact marriage.[40]

To summarize: The presumption only applies when the marriage at issue is found to be intact.[41] To the extent that the marriage is intact, the presumption is irrebuttable, and cannot be overcome.[42] A court may not order genetic testing unless and until that presumption is overcome.[43] But an intact marriage renders the presumption both applicable and irrebuttable, rendering the old avenues for rebuttal—non-access to the wife, impotence, sterility—irrelevant. Under the operative regime, the only way to secure court-ordered testing is to prove that the marriage is no longer intact.

Sitler does not challenge the results that obtain from application of the presumption. If we decline to disturb the existing paradigm, the presumption prevents him from securing court-ordered testing. Even voluntary testing confirming his belief that he is Child's biological father would be futile. The trial court concluded that Jones and her husband are in an intact marriage, and Sitler does not challenge that factual determination.[44] Instead, Sitler challenges the paradigm. He asks us to step back and reconsider the presumption's place in our jurisprudence. In his view, the presumption

---

[40] Our cases to date have not acknowledged the circularity of this framework nor the abandonment of the traditional grounds for rebuttal. Evidently, this has caused some confusion in the lower courts as to whether access, impotence, and sterility are still relevant to the analysis. *See, e.g.*, TCO 2, at 2 (explaining that the presumption had not been rebutted by evidence of non-access, impotence, or sterility, and that the presumption was irrebuttable because the marriage was intact).

[41] *See Brinkley*, 701 A.2d at 251 (plurality); *B.C.*, 310 A.3d at 735.

[42] *B.C.*, 310 A.3d at 735; *Strauser*, 726 A.2d at 1054.

[43] *See John M.*, 571 A.2d at 1388; *Trojak*, 634 A.2d at 206 ("A court may order blood tests to determine paternity only when the presumption of paternity has been overcome.").

[44] TCO 1, at 4. *See also* N.T, 8/21/2023, at 30-31 (R.R. at 60a-61a) ("As a factual finding . . . I'm going to find that this is an intact marriage. I don't have a choice. Everyone inside it says it's intact.").

has outlived its usefulness. Sitler asserts that the interests of an alleged biological parent, together with the best interests of the child, "must prevail over the Commonwealth's interest in the preservation of marriage."[45] In *B.C.*, this Court chose not to reassess the continued viability of the presumption of paternity, opining that the issue had not been preserved and fully developed.[46] Having preserved and developed the issue below, Sitler asks us now to reevaluate the presumption.

At the time that *Brinkley* was decided, and in the twenty-six years since, some have questioned the enduring wisdom of the presumption, and its place in paternity determinations. We review the major criticisms of the presumption, its surviving justifications, and the presumption's place in our jurisprudence.

Over the last century, some grounds upon which the presumption of paternity rests have begun to erode. The legitimacy rationale for the presumption dissipated with the fall of legitimacy-based classifications in the law.[47] More recently, some have questioned the remaining foundation on which the presumption rests: preserving marriages and, by extension, family units. For one thing, it is uncertain that the prevailing policy of the Commonwealth remains determined above all to prevent the dissolution of marriages.[48] In 1980, the General Assembly embraced no-fault divorce,[49] and, in the decades since,

---

[45]   Sitler's Brief, at 9. Jones did not brief or otherwise participate in the proceedings before this Court or the Superior Court.

[46]   *B.C.*, 310 A.3d at 737.

[47]   *See id.* at 730 (citing *John M.*, 571 A.2d at 1383 n.2).

[48]   *See Brinkley*, 701 A.2d at 253 (Nigro, J., concurring and dissenting) ("In light of the changed, and increasingly fluid, nature of the family, and the increased rates of divorce and separation, [the presumption of paternity and paternity by estoppel] have become less reflective of social reality."); *Id.* at 258 n.5 (Newman, J., concurring and dissenting) (citing rising incidence and growing social acceptance of divorce).

[49]   The Divorce Code, Act of April 2, 1980, P.L. 63 (repealed 1990).

the General Assembly has reduced the time period that married persons must wait to obtain a divorce decree.[50] As well, on a practical level, some have questioned whether the presumption of paternity does, in fact, serve the interest of keeping families intact.[51]

As the social and legal landscape around family dissolution has changed, the science of determining paternity has evolved. An unheralded but patent historical justification for the presumption was that—unless a husband was "beyond the four seas"—there was no sure way to ascertain who, in fact, was a child's biological father.[52] In the early days of paternity testing, blood tests had emerged that could sometimes exclude a man as a potential biological father. At the outset, these tests were not accurate enough to confirm a father's identity.[53] By the 1980s, some sixty-two different blood-typing procedures were in use, and these could be applied in combination to yield a more

---

[50]    *See id.* § 201(d)(1) (three years); Act of Dec. 19, 1990, P.L. 1240, § 3301(d) (two years); Act of Oct. 4, 2016, P.L. 865, § 3301(d) (one year).

[51]    *See Brinkley*, 701 A.2d at 254 (Nigro, J., concurring and dissenting) (questioning whether "judicious use of blood testing will necessarily result in any more strain on a marriage" than forcing a husband to care for a child he knows is not his, and noting that the use of testing would eliminate instances where a man is deceived into believing that a child is his).

[52]    *See* Feinberg, *supra* n.24, at 250 (noting that the presumption provided a solution to the "evidentiary impasses" involved in determining paternity before scientific testing became available).

[53]    *See Commonwealth v. English*, 186 A. 298, 300 (Pa. 1936) (blood tests requested by alleged father could exonerate a man roughly 15% of the time, "but in no case [do they] incriminate"); 1 MᴄCᴏʀᴍɪᴄᴋ ᴏɴ Eᴠɪᴅ. § 205.2 (8th ed.) ("[U]nder the early [blood grouping] system, a positive test result merely meant that the accused was, on average, one of the 87% of the male population possessing the requisite genotypes. Such evidence is not very probative, and the fear that the jury would give it more weight than it deserved, cloaked as it was in the garb of medical expertise, prompted many courts to exclude it as unduly prejudicial.").

accurate probability of paternity.[54]  But blood tests were, by nature, invasive,[55] and running multiple different tests in order to secure a more accurate result was costly.[56]

Today, DNA testing is more accurate, more affordable, and less intrusive than the blood tests of the 1980s.[57]  The DNA test sought by Sitler obtains a sample by means of an oral swab rather than a blood draw.  A sample from the alleged father presumably would establish his own biological relationship to the child, or lack thereof, without need for a sample from the presumed father.[58]  These tests are now readily available for purchase by anyone, whether online or at a drugstore.[59]

---

[54]  John P. Luddington, *Admissibility and Weight of Blood-Grouping Tests in Disputed Paternity Cases*, 43 A.L.R. 4th 579 § 2(a) (1986); *see* 4 MOD. SCI. EVIDENCE § 31:2 (2023); 1 MCCORMICK ON EVID. § 205.2 (8th ed.).

[55]  *See John M.*, 571 A.2d at 1385-86 ("The person whose blood is sought has clear privacy interests in preserving his or her bodily integrity.").

[56]  John P. Luddington, *Admissibility and Weight of Blood-Grouping Tests in Disputed Paternity Cases*, 43 A.L.R. 4th 579 § 2(a) (1986).

[57]  *See* 4 MOD. SCI. EVIDENCE § 31:3 (2023); *B.C.*, 310 A.3d at 740 (Wecht, J., concurring); *Brinkley*, 701 A.2d at 186 n.9  (Newman, J., concurring and dissenting) (explaining that "blood grouping tests provide circumstantial evidence of paternity whereas DNA test results provide direct evidence of biological parentage, because DNA matches establish affirmative identification of biological parentage" (citing *Reed v. Boozer*, 693 A.2d 233, 238 (Pa. Super. 1997)).

[58]  Sitler's complaint requests court-ordered testing of Child only.  Complaint, at 1 (R.R. at 3a).

[59]  *See, e.g., Express DNA Paternity Testing for Child and Father*, AMAZON, https://www.amazon.com/HomePaternity-Paternity-Confidence-Included-Overnight/dp/B0BWQV4ZSR/ref=sr_1_6?crid=2B1Q30X4EHTE&dib=eyJ2IjoiMSJ9.kgC31sWF5uwdmCRAq77dI17_YmSE4w4sUDUB5bMi0jEGSrAD8xfaw579V_Yv6dXzXTuE9eEf0gOXpcc74ZJsfjDDtFjWmNOULFpocwxqpgjMEYnriV672XsNSIii1whWMhFyicr7XPc7-wGVhyneQMVdzzMxGvKmbv2HbyC_rwMazqVUHwqI94uKROrmBftch1E3Yp7HH9xopn-4Vvncq9LmFOWrLsRkNSAIE77JUC6cplMCrtIwwEIX4vM5UapfUj13ZC3Q0u7LH8JDAoVfmQoC_04jBnKJWydXIjnQXqE.ej4uu7A6ULh2vbg8Sd-FXgXqHDiDEOlWhuzPEd_jnPU&dib_tag=se&keywords=paternity+dna+test&qid=17265 (continued…)

At its inception, the presumption supplied a fact that, otherwise, could not be categorically determined. The traditional avenues for rebuttal reflect only those factual indicia available before the dawn of genetic testing: whether the husband could not have "accessed" the wife at the time of conception, and whether the husband was impotent or sterile. With the emergence of *in vitro* fertilization and advances in treatment for men's reproductive health, these traditional avenues for rebuttal no longer reflect insurmountable obstacles to conception. In the past, the presumption helped fill in a critical blank. Today, the presumption forces courts to turn a blind eye to a fact that can be determined readily by empirical evidence, and that consenting parties may discover on their own in any event.[60]

Critics have warned that, in prioritizing the Commonwealth's interest in preserving marriages, the presumption categorically ignores or discounts the interests of both the child and the alleged father. This Court has acknowledged that an alleged father has a right to assert a paternity claim and to seek recognition as a parent in a court of law.[61] At the same time, we have categorically and conclusively placed the interest of the

---

20434&sprefix=paternity+dna+test%2Caps%2C106&sr=8-6 (last visited Sept. 16, 2024); *At-Home DNA Paternity Test Kit*, WALGREENS, https://www.walgreens.com/store/c/walgreens-at-home-dna-paternity-test-kit/ID=300440078-product?ext=gooFY-24_LB-RDG_CH-SEARCH_CN-RDG-OwnBrand_CA-FOS_MT-PLA_LG-EN1_RE-NA_MK-GM_OB-SALES_PK-OMNIREV_KT-NA_KM-NA_AS-GOO__pla_local&gclsrc=aw.ds&gclsrc=aw.ds&gad_source=4&gclid=EAIaIQobChMIuLm7wMCdiAMVsXBHAR1CzAa1EAQYAiABEgLQYfD_BwE (last visited Aug. 30, 2024).

[60] *See B.C.*, 310 A.3d at 740 (Wecht, J., concurring); *Brinkley*, 701 A.2d at 188 (Newman, J., concurring and dissenting); *see also id.* at 181-82 (Zappala, J., concurring) (arguing that testimony establishing that the married couple did not have sex during the period when the child was conceived should suffice to overcome the presumption); *id.* at 186 n.8 (Newman, J., concurring and dissenting) (same).

[61] *See John M.*, 571 A.2d at 1385 (citing *Adoption of Walker*, 360 A.2d 603 (Pa. 1976); *Stanley v. Illinois*, 405 U.S. 645 (1972)).

Commonwealth in preserving marriages above the interests of a potential father who seeks to discover the truth of his biological relationship with a child and who attempts to assume the attendant rights and responsibilities of legal parenthood.[62] Dissenting in *Strauser*, Justice Nigro asserted that a couple's marital status "should [not] serve as a license to completely disregard a biological father's interest in having a relationship with his child."[63] In *Brinkley*, Justice Newman went so far as to opine that the existing scheme terminates the rights of biological fathers without due process.[64]

Some have urged that the child at the center of a paternity dispute has an interest in knowing the identity of his or her biological father, and, by extension, the child's own paternal background, health profile, and ethnic heritage.[65] The news that the man whom a child believed to be his or her father is in fact a biological stranger can be damaging to a child's relationships and sense of identity. This concern is much less compelling with respect to a child as young as the one in the instant case, to whom the result of an oral swab means nothing. The distress that such news may cause when it breaks later in a child's life may argue for testing when it is sought early on. Early testing also may serve the interests of the presumed father. In today's case, Husband has testified that he would continue to parent Child regardless of the biological truth. In other cases, early testing

---

[62] *See John M.* at 1386 ("There are other interests at stake in this case besides those of appellant-husband and appellee-putative father . . . There is, in short, a family involved here."); *id.* at 1388 (Nix, J., concurring) ("Whatever interests the putative father may claim, they pale in comparison to the overriding interests of the presumed father, the marital institution and the interests of this Commonwealth in the family unit.").

[63] *Strauser*, 726 A.2d at 1057 (Nigro, J., dissenting).

[64] *Brinkley*, 701 A.2d at 187 (Newman, J., concurring and dissenting). Sitler has not asserted that the presumption violates his due process rights. Accordingly, any such issue is not presently before us.

[65] *See B.C.*, 310 A.3d at 741 n.26 (Wecht, J., concurring); *Strauser*, 726 A.2d at 1057 (Nigro, J., dissenting) ("[F]or medical and other reasons, it may very well be in the best interests of [the child] to know the identity of her biological father.").

may prevent a presumed father from being deceived into raising and supporting a child that is not his.[66]

On the other hand, the presumption of paternity may serve to shield a child from the upheaval that can result from the introduction of a new legal parent, particularly when the child already has established a close bond with the man whose paternity is challenged. In such instances, the work of the presumption is not to protect a marriage against the conduct of its own constituents, but rather to protect an existing family unit, a unit to which the child belongs.[67]

Some have expressed consternation that the common law privileges the Commonwealth's interest in the institution of marriage over the best interests of the child. Conversely, a rule that would discard the presumption and that would privilege the results of DNA testing above all might often disserve the child's best interests, especially in view of the reality of the relationships involved in any given case. A case-by-case approach, sensitive to individualized facts and contexts, is best-suited to the task of resolving paternity disputes.[68]

---

[66] *See Brinkley*, 701 A.2d at 182 (Nigro, J., concurring and dissenting) ("Blood testing would also work to eliminate situations where a man is deceived into believing he is the father and is then made to bear legal responsibility, by reason of estoppel, for a child that is not his.").

[67] *See B.C.*, 310 A.3d at 736 (explaining that the presumption "protects against the potential insertion of a third party into the functioning family unit upon resolution of the paternity action").

[68] *See id.* at 741 (Wecht, J., concurring) ("[T]he General Assembly could—and should—implement a multi-factor statutory test for paternity determinations. This legislative test could take into account the various considerations, such as the DNA test results, the child's relationship with the parties, the emotional well-being of the child, and the child's bond with the parties." (citing David N. Wecht & Jennifer H. Forbes, *A Multi-Factor Test Would Aid Paternity Decisions*, 82 Pa.B.A.Q. 3, 118 (2011))); *Brinkley*, 701 A.2d at 253-54 (Nigro, J., concurring and dissenting) ("Abandoning the strict use of the [presumption of paternity and the doctrine of paternity by estoppel] would allow our courts to examine the situation presented, to compel blood testing if the appropriate showing is (continued…)

The presumption of paternity has proven highly durable in Pennsylvania law. Its lingering justification—keeping families intact—though weakened in the age of no-fault divorce, still carries great weight in many circumstances. The rigidity and irrefutability of the presumption is nonetheless overinclusive, an ill fit for modern social and scientific realities. In *K.E.M.*, this Court made clear that the doctrine of paternity by estoppel should apply only when estoppel serves the best interest of the child.[69] Today, we hold that the presumption of paternity must be subordinated to the best interests of the child as well. The presumption of paternity once vindicated the worthy goal of sparing "illegitimate" children the harms that they would otherwise suffer by virtue of that stigmatic status.[70] Today, the presumption aims to serve the Commonwealth's interest in preserving marriages that function as families. The balancing of that interest—as against the interests of the child involved, the putative father, the mother, and the mother's husband—has become more complex and nuanced. Our jurisprudence must evolve accordingly.

In the past, so long as the mother and her husband remained in an intact marriage, no amount of DNA evidence could ever overcome the husband's presumed paternal status. Where an intact marriage was concerned, an outsider attempting to establish his paternity in a court of law could not even discover whether his suspicions were true, absent consent of all parties. In *John M.*, we explained that subjecting an unwilling presumed father to blood tests implicated his constitutional right to privacy, and we balanced the competing interests to determine whether an invasion of such privacy was

---

made, and to weigh the competing factors in order to reach a just result in each case."); *K.E.M.*, 38 A.3d at 813 (Orie Melvin, J., concurring) ("Protection of the child is paramount, and I lend my voice to those calling for the Legislature to specify factors to consider in making paternity determinations.").

[69] *K.E.M.*, 38 A.3d at 809.

[70] *See John M.* 571 A.2d at 1383 n.2; Feinberg, *supra* n.24, at 249-50.

justified. On one hand, we acknowledged the interest of the alleged father in securing test results, and we noted that "the needs and interests of the child [were] of paramount concern."[71] But we found that these interests were outweighed by the husband's privacy interest, and, perhaps more emphatically, the Commonwealth's interest in preserving the family unit by rejecting the "unwanted intrusions of outsiders."[72]

Decades later, advances in the field of DNA technology have combined with legal and social developments to alter the landscape. Modern DNA testing has reduced concerns over intrusions upon the privacy interest of a presumed father (like Husband here). Science has evolved such that there is no need to invade the presumed father's privacy with a blood draw. An oral swab of the child and of a willing, alleged biological father like Sitler can either eliminate or confirm that third party's biological connection to the child, without any intrusion on the husband's privacy rights. Moreover, while this Commonwealth retains its interest in preserving marriages and family units, it also has manifested a recognition that divorce is not uncommon and an awareness that divorce decrees, when sought, should be available without stigma or undue delay. Judicial refusal to order testing appears increasingly unlikely to prevent a marriage from dissolving. In the era of commercial DNA testing, it would be naive to suppose that our courts have the power to prevent the facts from coming to light, or to inoculate marriages against the ensuing consequences.

At the same time, to discard the presumption of paternity outright, as Sitler urges, would foster disruption of critical relationships between some children and their caregivers, in blind service of aligning biological with legal parentage in all cases. In the absence of legislative action, the presumption of paternity can protect the formation of

---

[71]     *John M.*, 571 A.2d at 1386.

[72]     *Id.*

families by married couples. If nothing else, it can offer a sound place to begin the inquiry: who's the father? Where no other contender emerges, the presumption places legal parentage with the mother's husband.

Contemporary courts must balance the interests of the Commonwealth in protecting intact families alongside the best interests of the child, while accounting as well for the interests of the person seeking to establish paternity and the interests of the wife and husband. The question of paternity begins—but does not end—with the presumption of paternity. If the marriage is intact at the time that the husband's paternity is challenged, the husband is presumed to be the father by virtue of the presumption. However, a third party challenger may rebut that presumption. In light of the competing interests involved, a challenger may rebut the presumption—and secure DNA testing that will determine paternity—by adducing clear and convincing evidence showing that: (1) there is a reasonable possibility that he is the father; and (2) determining parentage based upon the results of DNA testing will serve the best interests of the child, with due consideration for the interests of the adults whose parental rights are at stake. Upon meeting that burden, a challenger may secure court-ordered DNA testing, which will then determine legal parentage.[73]

At common law, the presumption of paternity could be overcome only if the husband was "beyond the seas" immediately before and during the pregnancy.[74] Over two centuries ago, we abandoned that rule on the ground that it was "contrary to human experience."[75] Human experience has evolved, and the narrow path to overcome the

---

[73] We leave undisturbed the doctrine of paternity by estoppel. *See supra* n.18. Suffice it to say that both "fictions" are now subordinate to the best interests of the child, which will vary widely from case to case. *See K.E.M.*, 38 A.3d at 809.

[74] *Cairgle*, 77 A.2d at 442.

[75] *Id.*

presumption is once again at odds with the world in which we live. The traditional bases to overcome the doctrine were rational in a society in which the only knowable facts germane to a child's parentage revolved around the physical possibility that the father could have impregnated the mother at the relevant time. And the narrowness of these grounds aligned with the serious threat of illegitimacy, the limited availability of divorce, and the social stigma associated with both. Scientific advancements have brought about a new way to discover the truth of a child's biological paternity. The General Assembly has shielded children from the once harsh consequences attending "illegitimacy," while enabling married persons to divorce more easily. In light of the changed landscape around separation and divorce, and the scientific revolution precipitated by the rise of DNA evidence, an irrebuttable presumption of paternity rests on outdated assumptions.

Paternity disputes, like other controversies involving a child's future, implicate the best interests of the child.[76] All else being equal, where two or more adults claim paternity, a child's best interests ultimately may lie in having the truth of the matter discovered. At the same time, an alleged biological father like Sitler may have an interest in establishing legal parentage, thereby becoming eligible for all of the rights and responsibilities that attend that status.[77] The genetic connection between father and child is not everything, and assigning biological relationships categorical primacy over substantive parent-child bonds would work an injustice of a different kind.[78] We will not

---

[76]    *See* 23 Pa.C.S. § 5328 (child custody to be determined based on the best interest of the child).

[77]    *See, e.g.*, 23 Pa.C.S. § 5324(1) (providing that a "parent of the child" has standing to pursue custody); *id.* § 4321(2) ("Parents are liable for the support of their children . . . .").

[78]    In more recent years, commentators have observed that, even as the old justifications underlying the presumption have fallen away, new ones have arisen. Same-sex couples and couples relying on assisted reproductive technologies ("ART") might look to the marital presumption to establish parentage of a child to whom one spouse is not (continued…)

gainsay the interests of the mother and of the presumed father, whose rights the trial court also must weigh. If, however, the court finds that a putative father has established, by clear and convincing evidence, a reasonable possibility that testing would reveal him to be the biological father and that the best interests of the child lie in uncovering and assigning paternity based upon the biological connections involved, DNA evidence is warranted.

We already have limited the doctrine of paternity by estoppel to situations in which the best interests of the child are served.[79] Upon a threshold showing that a putative father might be the biological father, the presumption of paternity must be subject to the same considerations. In reaching this conclusion, we join the majority of states in lifting our near-absolute embargo on DNA evidence in paternity disputes involving married mothers. In almost every state, some variation on the presumption of paternity remains.[80] However, many states have allowed the presumption to be overcome by DNA evidence

---

biologically related. *See* Feinberg, *supra* n.24, at 254-57 (noting that the marital presumption remains the most common way of identifying a person other than the individual who gave birth as a child's legal parent and that most courts that have addressed the issue have held that the presumption extends to a non-birthing spouse in a same-sex couple); Marisa S. Fein, *An Inequitable Means to an Equitable End: Why Current Legal Processes Available to Non-Biological, LGBTQ+ Parents Fail to Live Up to Obergefell v. Hodges*, 14 DREXEL L. REV. 165 (2022) (proposing a marital presumption not overcome by a lack of biological connection); Douglas NeJaime, *The Nature of Parenthood*, 126 YALE L.J. 2260, 2340-41 (2017) (proposing a gender-neutral marital presumption to afford equal treatment to same sex couples and couples using ART). As well, this Court has recognized parentage by contract in these circumstances. *C.G. v. J.H.*, 193 A.3d 891, 904 (Pa. 2018).

[79]    *K.E.M.*, 38 A.3d at 810.

[80]    *See* Douglas NeJaime, *The Nature of Parenthood*, 126 YALE L.J. 2260, 2339 (2017) ("Presently all but one state maintain a marital presumption that derives a spouse's parentage from marriage to 'the woman giving birth' or 'the natural mother.'"); James J. Vedder & Brittney M. Miller, *Presumptions in Paternity Cases: Who Is the Father in the Eyes of the Law?*, 40 FAM. ADVOC. 26 (2018) (noting that "[m]ost states have enacted paternity laws that create some form of the marital presumption of paternity.").

under at least some circumstances.[81]  Some hold that DNA evidence affirming an alleged

biological relationship definitively rebuts the presumption.[82]  Others, with an eye to the

natural complexity of these disputes, consider the best interests of the child in determining

whether the presumption should yield to DNA testing.[83]  We embrace the spirit of the

latter approach: courts must consider the best interests of the child within the complex

and varied contexts in which paternity disputes arise, in order to determine whether legal

parentage should be judged by the results of DNA testing.

Paternity cases, like most disputes in the area of family law, are highly fact-sensitive.  As such, they are rarely amenable to resolution through bright line rules.  Our

attempts to bind the question of paternity to wooden questions about the status of the

marriage are futile, and can work a great disservice upon both the child and the adult

parties.  Our trial courts are well-equipped to consider and weigh a multitude of complex

---

[81] Feinberg, *supra* n.24, at 252.

[82] *Id.*; *see, e.g.*, *Est. of Smith v. Smith ex rel. Rollins*, 130 So. 3d 508, 513 (Miss. 2014); *Rydberg v. Rydberg*, 678 N.W.2d 534, 541 (N.D. 2004); *Bartlett v. Com. ex rel. Calloway*, 705 S.W.2d 470, 473 (Ky. 1986) ("When the advances of science serve to assist in the discovery of the truth, the law must accommodate them. The law cannot pick and choose when truth will prevail.").

[83] *See* June Carbone & Naomi Cahn, *Nonmarriage*, 76 MD. L. REV. 55, 87 (2016) ("In many states, even proof that the husband is not the biological father does not solely rebut the presumption; instead, doing so may involve the consideration of the child's interests, the degree to which the husband assumed a paternal role, and/or the biological father's ability and willingness to provide support."); *see, e.g.*, *Simmonds v. Perkins*, 247 So. 3d 397, 401 (Fla. 2018) (holding that a biological father has standing to rebut the presumption if he has "manifested a substantial and continuing concern for the welfare of the child," and that the presumption may be overcome in the best interests of the child (internal quotation marks omitted)); *Greer ex rel. Farbo v. Greer*, 324 P.3d 310, 318 (Kan. Ct. App. 2014) (explaining that Kansas' statutory scheme creates competing presumptions based on marriage and genetics, to be resolved based on the best interests of the child); *D.W. v. R.W.*, 52 A.3d 1043, 1057 (N.J. 2012) (listing eleven factors, beyond the best interests of the child, to determine whether to grant or deny genetic testing); *R.N. v. J.M.*, 61 S.W.3d 149, 157 (Ark. 2001) (directing courts to consider the best interests of the child before ordering testing).

factors in family controversies.[84]  Sensitivity to the facts is critical to the fair adjudication of parentage disputes, and so we relieve trial courts of the burden of blind adherence to a rigid, irrebuttable presumption of paternity.  If the marriage is intact, courts should begin with the presumption.  But if a challenger presents clear and convincing evidence that he might be the father, courts should consider the individual circumstances before them, and should hew with meticulous sensitivity to the best interests of the child at hand in determining whether to order DNA testing.  Courts should also consider the interests of the party seeking to establish paternity as well as those of the mother and her husband.[85]  The Supreme Court of the United States has long recognized that parents have a fundamental right "to make decisions concerning the care, custody, and control of their children."[86]  In adjudicating who a child's legal parents are, the adults vying for paternity also have significant interests at stake.

The question of how to adjudicate paternity when multiple adults vie for legal parentage continues to beg comprehensive legislative action.  The General Assembly could yet choose to determine how to assess, weigh, and compare changes that modernity has wrought in science and society, and how to prioritize competing paternity

---

[84]  *See, e.g.*, 23 Pa.C.S. § 5328 (identifying factors to consider in custody); *id.* § 3502 (identifying factors for equitable distribution); *id.* § 3701 (factors for determining alimony).

[85]  As the Supreme Court of New Jersey has explained, there is more at issue in a paternity dispute than the interests of the child alone:

> Although the best-interests-of-the-child standard governs most determinations involving children, more is at stake here.  The party seeking testing also has an interest in a determination of paternity.  Indeed, it may be that in many, if not most, cases where genetic testing is ordered to refute a presumption of paternity, some destabilization of the child's life is inevitable.  If this were the only concern, genetic testing would never be ordered to rebut a presumption of paternity.

*D.W. v. R.W.*, 52 A.3d 1043, 1057 (N.J. 2012) (citations omitted).

[86]  *Troxel v. Granville*, 530 U.S. 57, 66 (2000).

claims. In the absence of legislative direction, we entrust the courts to resolve these disputes on a case-by-case basis, within the framework announced herein. In that process, courts should accrue and apply the wisdom of the common law, now focused upon the best interests of the child, and with due respect as well to the interests of the various adults attempting to establish and/or maintain legal parentage.[87]

To summarize: In order to determine the paternity of a child born in wedlock, courts first must determine whether the marriage is intact at the time of the paternity challenge. If so, then the presumption of paternity applies, and dictates that, regardless of biology,

---

[87] *Cf. K.E.M.*, 38 A.3d at 809 ("Implementation of a common law scheme encompassing paternity by estoppel vindicating the best interests of children in paternity disputes on an individualized basis will obviously require development through multiple cases as different fact patterns arise.").

Unless and until the legislature acts, we entrust the contours of the best interests inquiry for purposes of determining legal parentage to the lower courts to develop on a case-by-case basis. For present purposes, we note that the factors included in Section 613 of the Uniform Parentage Act appear well-aligned with the standard we announce today, insofar as they account for both the best interests of the child and the interests of potential parents. Those factors include:

(1)　the age of the child;
(2)　the length of time during which each individual assumed the role of parent of the child;
(3)　the nature of the relationship between the child and each individual;
(4)　the harm to the child if the relationship between the child and each individual is not recognized;
(5)　the basis for each individual's claim to parentage of the child;
(6)　other equitable factors arising from the disruption of the relationship between the child and each individual or the likelihood of other harm to the child; . . .
(7)　the facts surrounding the discovery [that] the individual [might or] might not be a genetic parent of the child; and
(8)　the length of time between the time that the individual was placed on notice that the individual [might or] might not be a genetic parent and the commencement of the proceeding.

*See* UNIF. PARENTAGE ACT § 613(a), (b)(1)-(2) (UNIF. L. COMM'N 2017) (renumbered).

the mother's spouse will be the child's parent. However, the presumption may be rebutted if the putative father produces clear and convincing evidence that: (1) there is a reasonable possibility that DNA testing would reveal him to be the child's biological father; and (2) determining parentage based upon DNA testing serves the best interests of the child, with due consideration for the interests of the potential father as well as the interests of the wife and husband. If the court finds no threshold possibility of paternity, or determines that adjudicating paternity by DNA testing would disserve the relevant interests, then the presumption governs. But if the court finds a threshold possibility of paternity, and determines that the balance of interests lies in assigning paternity based upon the biological truth, the presumption must yield, and the court should order appropriate genetic testing to determine paternity of the child.[88]

In applying and affirming an irrebuttable presumption of paternity here, the lower courts did not have the benefit of our reconsideration of the presumption. Therefore, we vacate and remand to the Superior Court for further proceedings consistent with this opinion.[89]

Chief Justice Todd and Justices Dougherty, Brobson and McCaffery join the opinion.

Justice Donohue files a concurring and dissenting opinion in which Justice Mundy joins, with the exception of footnote 13.

---

[88]  Estoppel may yet, of course, independently preclude DNA testing, even if the presumption does not. *See Trojak*, 634 A.2d at 206.

[89]  Upon consideration, Sitler's Petition for Leave to File Designation of the Record *Nunc Pro Tunc* is granted.